CHARLES H. BROWER, #1980-0
900 Fort Street, Suite 1210
Honolulu, Hawaii 96813
Telephone (808) 526-2688
Facsimile: (808) 526-0307
E-mail: honolululaw808@gmail.com

MICHAEL P. HEALY, #4777-0
1188 Bishop Street, Ste 3304
Honolulu, Hawaii 96813
Telephone: (808) 525-8584
Facsimile:  (808) 376-8695
E-mail: honolululawyer@outlook.com

Attorneys for Plaintiff
VANESSA VASQUEZ

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| VANESSA VASQUEZ,<br><br>　　　　　Plaintiff,<br><br>　　vs.<br><br>KIEWIT INFRASTRUCTURE WEST, CO.,<br><br>　　　　　Defendant. | ) CIVIL NO. 19-00513 HG-WRP<br>)<br>)<br>) SECOND AMENDED<br>) COMPLAINT; SUMMONS<br>)<br>)<br>)<br>)<br>)<br>) |

## SECOND AMENDED COMPLAINT

COMES NOW, Plaintiff VANESSA VASQUEZ, by and through her attorneys Charles H. Brower and Michael P. Healy, and for causes of action against Defendant, alleges and avers as follows:

## NATURE OF CASE

1. Plaintiff VANESSA VASQUEZ (hereinafter "VASQUEZ") is and was at all times mentioned herein a resident of the State of Hawaii.

2. Plaintiff is an African American female.

3. Defendant KIEWIT INFRASTRUCTURE WEST, CO., (hereinafter "KIEWIT") is a foreign profit corporation, incorporated in the State of Delaware, with a principal place of business in the State of Hawaii.

4. Plaintiff was hired by Defendant KIEWIT on July 19, 2015, as a Journeyman Iron Worker.

5. Plaintiff was fully qualified to work as a Journeyman Iron Worker.

6. On September 16, 2015, Plaintiff was terminated from her position with Defendant KIEWIT due to discrimination based on her sex, race, disability, and in retaliation for complaining about unlawful discrimination, as set forth herein.

## JURISDICTION

7. The jurisdiction of this Court is pursuant to Title VII of the Civil Rights Act of 1964, as amended, and the Americans With Disabilities Act of 1990.

8. The administrative prerequisites for filing this cause of action have been fulfilled. A Dismissal and Notice of Rights was issued by the Equal Employment Opportunity Commission ("EEOC") on June 28, 2019.

9. Prior to the issuance of the Dismissal and Notice of Rights, the EEOC had determined that there was reasonable cause to believe that Plaintiff had been terminated due to her sex.

## STATEMENT OF FACTS

10. In 2001, Plaintiff began her career working as an Ironworker in Seattle, Washington, and became an active member of an Ironworker's Union.

11. In 2005, Plaintiff entered a Journeyman Ironworker apprenticeship program and successfully completed her apprenticeship training. Plaintiff's ironworking skills were in the area of a structural ironwork/welder.

12. From 2005 through 2015, Plaintiff held numerous jobs as a Journeyman Ironworker, primarily in Seattle and Las Vegas.

13. On February 10, 2015, Plaintiff's Union membership was transferred from her mainland union to Local 625, the Honolulu Local Ironworkers Union, of the International Association of Bridge, Structural, Ornamental and Reinforcing Iron Workers, AFL-CIO.

14. On March 16, 2015, Local 625 mailed Plaintiff a new membership card, listing her as a Journeyman Ironworker.

15. In March of 2015, Plaintiff began working as a Journeyman Ironworker on several short-term jobs in Honolulu. Her first job was at

Northwest Tower Crane Service, where she was hired to assist in the disassembly of a crane.

16. Plaintiff subsequently worked as a Journeyman Ironworker with Evergreen Pacific Steel for approximately two weeks. On March 17, 2015, Plaintiff was laid off due to lack of work.

17. From April through July of 2015, Plaintiff worked as a Journeyman Ironworker for Swanson Steel Erectors, Inc., located in Honolulu, Hawaii. Plaintiff was terminated from employment on this job due to a "Reduction in Force".

18. In July of 2015, Plaintiff received a telephone call from Local 625 advising Plaintiff that she had been dispatched to report to work for KIEWIT as a Journeyman Ironworker.

19. On July 19, 2015, Plaintiff interviewed with Todd Makela (hereinafter referred to as "MAKELA"), a KIEWIT manger. Plaintiff was hired for the position of a "Structural Journeyman Ironworker". Upon MAKELA'S review of Plaintiff's qualifications and his interview with Plaintiff, he advised Plaintiff that she was hired and would begin working that evening. Plaintiff later reported to the main office where she completed paperwork and an orientation, after which she was taken to the job site and introduced to Juan Torice (hereinafter referred to as "TORICE"), her direct supervisor.

20. On August 22, 2015, Plaintiff attended Defendant KIEWIT's Appreciation Dinner, where Plaintiff was introduced to Levi Fry (hereinafter referred to as "FRY"), a KIEWIT male supervisor. FRY immediately questioned Plaintiff about being a female Journeyman Ironworker.

21. On August 28, 2015, TORICE went on leave and was replaced by FRY, as Plaintiff's immediate supervisor. FRY constantly harassed, belittled, embarrassed and mistreated Plaintiff in front of Plaintiff's male co-workers. FRY raised his voice and yelled at Plaintiff, in front of other male workers. FRY did not yell at or mistreat any of the male workers. FRY also appeared to have deliberately created unsafe working conditions for Plaintiff.

22. On one occasion, FRY directed Plaintiff to move PVC pipes, 20 feet long, into a hole. When Plaintiff went into the hole to receive the pipes, FRY passed Plaintiff three poles at a time, deliberately making Plaintiff's assignment almost impossible to accomplish. Even after asking FRY to "slow down" and to send only one pole to her at a time, which was the proper way to do this task, FRY said to Plaintiff: "What, you can't keep up"? Soon after this incident, Plaintiff called TORICE and informed him about what just happened with FRY. Plaintiff reported that FRY failed to follow proper communication and safety protocol, which created safety issues, and that she believed FRY was discriminating against her based on her gender, race, and color.

23. Customarily, professional protocol is for a supervisor to disseminate information to Journeymen, who in turn communicates information and instructions to the Apprentices. During the time FRY acted as Plaintiff's supervisor, he purposely ignored protocol by communicating information and instruction directly to the Apprentice working under Plaintiff's supervision. FRY'S direct communication to Plaintiff's Apprentice created possible safety issues for Plaintiff and others on the job.

24. On September 2, 2015, Plaintiff and an apprentice assigned to assist her were directed to move a "strand pusher" machine, weighing approximately 460 to 600 pounds, up an incline with the use of a pallet jack, a task that requires two to three people for safety reasons. In the middle of performing this task, FRY radioed Plaintiff's assistant and told him to perform another assignment, leaving Plaintiff alone to complete the task and carry all the load. Plaintiff radioed FRY asking him how she was supposed to do the job alone. FRY simply told her: "do the best you can – just get it up here." For fear of being reprimanded or yelled at, Plaintiff attempted to do as FRY instructed and sustained a work-related injury to her low back and right shoulder, which was later proved to be a torn right rotator cuff and back strain with radiculopathy.

25. On September 2, 2015, immediately after being injured, Plaintiff reported the incident and injury to Todd Makela (hereinafter referred to as "MAKELA"), head of safety. MAKELA required Plaintiff to

take a drug test in his office. Initially, Plaintiff was advised that the test was "dirty". Within an hour, Plaintiff was re-tested at Kapiolani Hospital; Plaintiff was advised that her drug test was clean. The safety officer who accompanied Plaintiff to the hospital advised Plaintiff to stay out of work until a doctor's review was performed.

26. On September 2, 2015, MAKELA and Vince Castro (hereinafter referred to as "CASTRO"), Plaintiff's supervisor, met with Union representatives to discuss Plaintiff's complaints about feeling "uncomfortable" in the workplace. The parties agreed to conduct an investigation.

27. On September 3, 2015, MAKELA and CASTRO notified Rae Magistro (hereinafter referred to as "MAGISTRO"), the Human Resources Manager, about Plaintiff's concerns.

28. On September 5, 2015, Plaintiff was sent to a clinic near the airport to be examined by KIEWIT'S hired medical examiner. CASTRO and another supervisor attended the examination with Plaintiff. While waiting to be examined by Defendant's medical examiner, Plaintiff advised CASTRO that she felt discriminated against by FRY when he took away her assistant in the middle of doing a two-person job, which resulted in her injury. Plaintiff complained to CASTRO that FRY had been discriminating against her due to her gender, race, and color.

29. On September 8, 2015, Plaintiff had a telephone conference with MAGISTRO about her complaints of discrimination. MAGISTRO advised Plaintiff to report to the office the following day to discuss her complaints of "discrimination" that Plaintiff raised with CASTRO while at the clinic.

30. On September 9, 2015, Plaintiff met with MAGISTRO at the Human Resources office. Plaintiff advised MAGISTRO that FRY was treating Plaintiff unequally because of her race and gender. Plaintiff also alleged that FRY deliberately created an unsafe work environment for Plaintiff. This meeting lasted approximately forty-five (45) minutes. MAGISTRO directed Plaintiff to write her concerns on a blank piece of paper, which MAGISTRO provided to Plaintiff, who wrote a statement in longhand writing. Plaintiff asked for a copy of the statement but was told that she could not have one. MAGISTRO stated that Plaintiff had to take the matter up with her superiors. A copy of the statement was never provided to Plaintiff. MAGISTRO advised Plaintiff, at the conclusion of their meeting, that an "in-house investigation" would be performed and Plaintiff would be advised of the outcome.

31. On September 16, 2015, Plaintiff was terminated from her position with Defendant KIEWIT. At the time of her termination Plaintiff did not have any disciplinary write-ups or negative performance evaluations, either in writing or verbally.

32. On September 16, 2015, MAGISTRO mailed Plaintiff a letter advising that an investigation into her "concerns" had been conducted. The letter stated, however, that the results of the investigation were confidential.

33. As a result of the September 2, 2015, incident Plaintiff sustained a torn right rotator cuff, lumbar strain with radiculopathy, and a sacroiliac strain, which prevented Plaintiff from being able to lift, bend, carry objects, or work.

34. On March 3, 2016, Plaintiff's Primary Care Provider ("PCP") confirmed, via an MRI reading, that Plaintiff sustained rotator cuff tears and tendonitis to her right shoulder. Plaintiff's PCP also reported that Plaintiff continued to experience lumbar pain, with radiculopathy and a sacroiliac strain. Plaintiff's PCP subsequently referred Plaintiff to an Orthopedic specialist for further evaluation and treatment.

35. In June of 2016, surgery was performed to repair Plaintiff's torn rotator cuff, sustained in the September 2, 2015, work related injury.

36. On or about April 12, 2017, Plaintiff's PCP released Plaintiff to return to light duty work.

37. On or about April 20, 2017, Plaintiff's PCP released Plaintiff to return to work on full time duty with no work restrictions.

38. If not for Plaintiff's sex, race, disability, and complaints about discrimination, Plaintiff would not have been terminated from her

employment with Defendant KIEWIT. Plaintiff was fully qualified and able to perform the essential function of her job with a reasonable accommodation.

39. Defendant failed to provide Plaintiff with a reasonable accommodation for her injuries. Specifically, Defendant failed to provide Plaintiff with adequate time off from work for her to receive the surgery necessary for Plaintiff to return to work full time without restrictions.

## STATEMENT OF CLAIMS

## COUNT I - DISCRIMINATION

40. Plaintiff repeats and re-alleges all prior allegations as if fully set forth herein.

41. Title VII of the Civil Rights Act of 1964, as amended, prohibits discrimination and termination due to sex, race, and based on retaliation for complaining of the discrimination.

42. The aforesaid acts and/or conduct of Defendant and its employees/agents constitutes discrimination as they were acts and/or failure to act by Defendant and its employees/agents in direct violation of Title of the Civil Rights Act of 1964, as amended.

43. Plaintiff has suffered, as a direct and proximate result of the aforesaid conduct, damages by way of loss of earnings and earning capacity, loss of fringe and pension benefits, and other benefits due her.

44. As a further direct and proximate result of said unlawful conduct, Plaintiff has suffered the indignity of harassment, the invasion of her right to be free from unlawful employment practices, and great humiliation, which is manifest in emotional distress.

45. As a further direct and proximate result of said unlawful employment practices, Plaintiff has suffered mental anguish, outrage, depression, severe anxiety about her future and her ability to support herself, harm to her employability and earning capacity as well as loss of a career advancement opportunity, painful embarrassment among her friends and co-workers, disruption of her personal life, and loss of enjoyment of the ordinary pleasures of everyday life for which she is entitled to an award of general damages.

COUNT II - DISABILITY DISCRIMINATION

46. Plaintiff incorporates paragraphs 1 through 39 as though fully set forth herein.

47. The Americans With Disabilities Act of 1990 prohibits discrimination due to a disability.    Plaintiff alleges that if she were not disabled the adverse action against her would not have occurred.

48. The aforesaid acts and/or conduct of Defendants constitute discrimination as they were acts and/or failure to act by Defendants and its employees in direct violation of the Americans With Disabilities Act of 1990.

49. Plaintiff has suffered, as a direct and proximate result of the aforesaid conduct, damages by way of loss of earnings and earning capacity, loss of fringe and pension benefits, and other benefits due her.

50. As a further direct and proximate result of said unlawful conduct, Plaintiff has suffered the indignity of harassment, the invasion of her right to be free from unlawful employment practices, and great humiliation, which is manifest in emotional distress.

51. As a further direct and proximate result of said unlawful employment practices, Plaintiff has suffered mental anguish, outrage, depression, severe anxiety about his future and his ability to support himself, harm to his employability and earning capacity as well as loss of a career advancement opportunity, painful embarrassment among her friends and co-workers, disruption of her personal life, and loss of enjoyment of the ordinary pleasures of everyday life for which she is entitled to an award of general damages.

## COUNT III – RETALIATION

52. Plaintiff repeats and re-alleges all prior allegations as if fully set forth herein.

53. The actions of Defendant's agents and employees in terminating Plaintiff or otherwise discriminating against her because she opposed the discrimination alleged herein were in violation of law for which Plaintiff is entitled to an award of damages to be proven at trial.

54. The actions of Defendant and its employees as described above are oppressive, outrageous, and otherwise characterized by aggravating circumstances enough to justify the imposition of punitive damages.

WHEREFORE, upon a hearing hereof Plaintiff prays that judgment be entered on all Counts:

A. For reinstatement to employment with Defendant KIEWIT with all benefits reinstated; and

B. For all damages to which Plaintiff is entitled, including general damages and other damages to be proven at trial; and

C. For special damages, including back pay, front pay and other expenses; and

D. For punitive damages; and

E. For attorney's fees, costs, and interest, including prejudgment interest; and

F. For such other and further relief as is appropriate.

DATED: Honolulu, Hawaii, March 2, 2020.

                                                 */s/ Michael P. Healy*
                                                 MICHAEL P. HEALY
                                                 CHARLES H. BROWER
                                                 Attorneys for Plaintiff
                                                 Vanessa Vasquez